UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

03 NOV 19 PM 3: 53

)
AMERICAN PREMIER UNDERWRITERS, INC., *formerly* )
*known as* PENN CENTRAL TRANSPORTATION )　MM
COMPANY )
)
One East Fourth Street )
Cincinnati, OH 45202 )
)
and )
)
AMERICAN FINANCIAL GROUP, INC. )
)
One East Fourth Street )
Cincinnati, OH 45202, )
)
*Plaintiffs* )
) Civil Action No. **1:08 C V 3 4 6**
*v.* )
) Judge ___ SPIEGEL. J.
NATIONAL RAILROAD PASSENGER CORPORATION, )
*also known as* AMTRAK )
)
60 Massachusetts Avenue, NE )
Washington, DC 20002, )
)
*Defendant* )
)

## COMPLAINT

Since 1971, American Premier Underwriters, Inc. ("APU"), formerly known as

the Penn Central Transportation Company ("PCTC"), has owned the majority of the

issued and outstanding common stock of Defendant, National Railroad Passenger

Corporation ("Amtrak"). The beneficial owner of this stock is APU's parent

company, American Financial Group, Inc. ("AFG"). Specifically, APU has owned

5,238,211 shares since 1971. Unfortunately, this lawsuit has become necessary at this time because Amtrak has taken APU's stock in violation of the Fifth Amendment of the United States Constitution, has wrongfully converted APU's stock, and has repudiated the agreement by which APU paid $52 million for the stock. Amtrak has also violated APU's due process rights as guaranteed by the Fifth Amendment by refusing to redeem APU's stock as mandated by Congress in the Amtrak Reform and Accountability Act of 1997.

To redress these actions on the part of Amtrak, APU seeks a declaratory judgment that Amtrak has violated APU's constitutional and statutory rights. APU also seeks damages for the violation of these rights. In the alternative, APU seeks restitution of the original $52 million paid to Amtrak, plus interest.

## PREFACE

1. In October 1970, the Federal Government established Amtrak, which took over almost all of the nation's intercity passenger rail service beginning in May 1971. Existing railroads, like PCTC, provided a significant portion of the new corporation's initial capitalization. This payment from the railroads was generally known as their "buy-in" fee. PCTC, along with other railroads that had been providing passenger service, contributed well over half of Amtrak's initial capital. Specifically, PCTC's fee for buying into Amtrak was $52,382,109. In consideration, PCTC received 5,238,211 shares of the common stock of Amtrak. APU continues to hold this stock today.

2. In 1973, the Federal Government established the Consolidated Rail Corporation ("Conrail"), which took over essentially all freight rail service in the

2

Northeast and Midwest in April 1976. Unlike Amtrak, Conrail was required to pay fair market value in cash for the pre-existing railroads' contributions.

3. The goal of both Amtrak and Conrail was the same: to modernize and rationalize rail operations, make them more efficient, and return them to profitability.

4. Conrail became a success. It received its last government investment in June 1981 and finished that year with a profit. In March 1987, the government sold its ownership interest in Conrail through what was then the largest initial public stock offering in the nation's history. This transaction, with added cash payments from Conrail to the U.S. Treasury, produced about $1.9 billion for the taxpayers and returned the Northeast-Midwest rail freight system to the private sector as a for-profit corporation, as Congress had envisioned when it created Conrail in 1973.

5. Amtrak, however, has been a completely different story. Unlike Conrail, which was managed and operated as a business for profit and for the benefit of its shareholder owners, Amtrak was, through a continuous process over the last 37 years, converted into a company not managed for profit, but instead operated to provide government-subsidized public transportation. Consequently, Amtrak has not become the efficient, profitable corporation that Congress originally intended and that was promised to APU and the three other railroads that purchased its common stock.

6. As a result of this conversion from a private, profit-making entity to a company operated for governmental purposes, Amtrak has forced upon its majority

3

common shareholder, APU, certain public economic burdens which should, in all fairness and justice, be borne by the public as a whole. This disproportionate public burden, forced upon APU by Amtrak, is precisely what the Takings Clause of the Fifth Amendment is designed to prevent.

7. Specifically, APU gave Amtrak $52 million in capital and received stock. Amtrak promised and was obligated as a matter of law to use APU's capital in a private, for-profit venture. Indeed, since 1971 Amtrak has always maintained that it was a private, for-profit company. In reality and over time, however, Amtrak gradually morphed from being a for-profit corporation into a company that primarily pursued public, governmental objectives. The chief governmental objective Amtrak pursued was to provide -- with APU's capital -- subsidized public passenger train service. Over the years, Amtrak used and eroded APU's capital to the point that in January 2008 Amtrak insisted that APU's stock was worthless.

8. In 1997 Congress acknowledged the injustice of using private capital for public purposes when it enacted the Amtrak Reform and Accountability Act of 1997. In Section 415(b) of this Act, Congress directed Amtrak to redeem by October 1, 2002, all of its outstanding common stock for fair market value.

9. Between 2000 and January 2008, Amtrak and APU held numerous meetings and discussions concerning redemption of the common stock. These negotiations were at the highest levels of the companies. They involved senior officers and directors of both companies. Amtrak's initial offer to APU in 2000 valued APU's 5,238,511 shares at the ridiculously low and arbitrary and capricious price of 3

4

cents per share. APU and the other common shareholders rejected this offer. As they were bound to do by the Amtrak Reform and Accountability Act of 1997, Amtrak and APU continued to negotiate in good faith over an amount that was just, fair and that passed constitutional muster. Indeed, in November 2007, Amtrak agreed to execute a Confidentially Agreement with APU to facilitate further and expanded negotiations over redemption of the shares.

10. Specifically, when they executed this Confidentiality Agreement, the parties intended to exchange proprietary business information concerning real estate and other assets. The parties contemplated a transaction in which APU would receive and develop real estate or other assets of Amtrak and that such a transaction would produce enough upside benefit by way of income or asset appreciation to allow the APU stock to be redeemed at a fair and just value. In January 2008, however, Amtrak made it clear to APU that it was not interested in continuing to discuss such a transaction. Amtrak made it clear at this time that such a transaction could not be used to arrive at a redemption price above Amtrak's valuation of the stock as essentially worthless.

11. As a result, APU has been forced to bring this action to redress Amtrak's violation of APU's constitutional rights and to enforce APU's statutory right to receive fair market value for its Amtrak stock. Since Amtrak is no longer interested in pursuing and fulfilling the Congressional mandate to redeem APU's common stock, that mandate and APU's constitutional rights must be enforced by this Court.

12. APU also seeks to recover damages for Amtrak's conversion of its statutory right to receive fair market value for its stock and/or for conversion of its capital contribution of $52 million.

13. Alternatively, APU seeks restitution of the initial capital contribution that was extracted from PCTC under a promise that the company would be operated as a for-profit corporation and that APU would have a reasonable opportunity to realize fair value for its investment in Amtrak. Amtrak's decision in January 2008 to no longer pursue a transaction that would give APU fair value for its common stock constitutes a repudiation of the promise made to APU. This repudiation entitles APU to restitution of its initial contractual payment to Amtrak of $52 million, plus interest.

14. Finally, APU seeks a declaratory judgment that Amtrak erroneously and unconstitutionally interpreted and/or implemented section 415(b) of the Amtrak Reform and Accountability Act.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1337, 1349, and 1361.

16. This Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367.

17. This Court also has diversity jurisdiction over this matter under 28 U.S.C. § 1332 because APU is not a citizen of any state of which Amtrak is a citizen, and the amount in controversy exceeds $75,000.

6

18. In addition, this Court has jurisdiction to award declaratory judgments under 28 U.S.C. §§ 2201-02.

19. Venue is proper in this district under 28 U.S.C. § 1391 because APU's headquarters and principal place of business are located in the Southern District of Ohio, and APU has suffered substantial injuries here. Moreover, Amtrak routinely conducts substantial business in this judicial district; it is thus subject to this Court's personal jurisdiction and resides in this district for purposes of venue. The APU shares of Amtrak stock that are the subject of this action are located in this district.

## PARTIES

20. Plaintiff APU, formerly known as the Penn Central Corporation and before that as PCTC, is a Pennsylvania corporation with its principal place of business in Cincinnati, Ohio.

21. Plaintiff AFG is the parent of APU and beneficial owner of the Amtrak stock pursuant to an inter-company transaction.

22. Defendant Amtrak is a corporation organized under the Rail Passenger Service Act of 1970 (described more fully below) and the corporation laws of the District of Columbia with its principal place of business in the District of Columbia. Although Amtrak is bound by the Constitution of the United States, Congress has specifically deprived Amtrak of sovereign immunity from suit by disavowing agency status for Amtrak. Accordingly, Amtrak is subject to suit in this Court for monetary damages. *See* 45 U.S.C. § 541.

## AMTRAK HAS TAKEN APU'S COMMON STOCK
## IN VIOLATION OF THE FIFTH AMENDMENT

23. Amtrak came into existence on October 30, 1970, when President Nixon

signed into law the Rail Passenger Service Act of 1970, Pub. L. No. 91-518, 84 Stat.

1327 (1970) (codified as amended at 49 U.S.C. § 24301 et. seq.) ("RPSA"). Amtrak

was to be "a for profit corporation, the purpose of which shall be to provide intercity

rail passenger service, employing innovative operating and marketing concepts so

as to fully develop the potential of modern rail service in meeting the Nation's

intercity passenger transportation requirements." RPSA § 301. Amtrak was created

"to revitalize rail transportation service in the expectation that the rendering of

such service along certain corridors can be made a profitable commercial

undertaking ...." H. Rep. No. 91-1580, *reprinted in* 1970 U.S.C.C.A.N. 4735, 4737,

4741.

24. In section 501 of RPSA, Congress established the goals for Amtrak in some

detail:

> (3) Improvement of the number of passenger miles
> generated systemwide per dollar of Federal funding by at
> least 30 percent within the two-year period beginning on
> October 1, 1981.
>
> (4) Elimination of the deficit associated with food and
> beverage services by September 30, 1982.
>
> . . .
>
> (6) Operation of Amtrak trains, to the maximum extent
> feasible, to all station stops within 15 minutes of the time
> established in public timetables for such operation.
>
> . . .
>
> (8) Implementation of schedules which provide a
> systemwide average speed of at least 60 miles per hour. . .

8

§ 501a.

25. To underscore Amtrak's status as a "for profit corporation," Congress further provided that it would "not be an agency or establishment of the United States Government" and that it would "be subject, … to the extent consistent with [RPSA], to the District of Columbia Business Corporation Act." *Id.* Amtrak, in fact, is incorporated under and subject to the District of Columbia Business Corporation Act.

26. Throughout RPSA and subsequent amendments Congress has repeatedly provided that Amtrak is a private corporation and does not enjoy governmental status. Given the clear legislative intent that Amtrak not be an agency or instrumentality of the United States, the United States Supreme Court has held: "We have no doubt, for example, that the statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit." *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374, 130 L. Ed. 2d 902, 115 S. Ct. 961 (1995). Consequently, Amtrak is subject to suit in this Court for APU's Fifth Amendment and other claims.

27. Amtrak, even though it is a private corporation and has been deprived by Congress "of those inherent powers and immunities of Government agencies," is still constrained by the Constitution. *Lebron,* 513 U.S. at 392. In this regard, the Supreme Court has held that Amtrak is "a Government entity for purposes of determining the constitutional rights of citizens affected by its actions." *Id.*

28. RPSA envisioned that Amtrak would, starting on May 1, 1971, take over the responsibility for providing intercity passenger services of railroads that had been providing such services before that date. Specifically, Amtrak was authorized to take over responsibility for passenger operations on a "basic system" to be designated by the Secretary of Transportation after consultation with the Interstate Commerce Commission, state railroad commissions, the railroads, and railroad labor groups. RPSA §§ 201-02.

29. Amtrak was authorized to enter into contracts with each railroad that had been providing passenger service. It was widely recognized at this time that PCTC's participation in Amtrak's scheme was vital to Amtrak's success. PCTC's trains comprised 70% of all the trains to be operated by Amtrak and 40% of the train miles. It would have been impossible for Amtrak to function effectively without PCTC's participation or buy-in.

30. RPSA provided that the railroads, in exchange for their buy-in, would receive either stock in an "amount equivalent in par value to each payment" or, in the alternative, a tax deduction equal to the amount of the payment. RPSA §§ 401(b)(2), 901(a).

31. PCTC opted to receive common shares of Amtrak and paid $52,382,109 to buy into Amtrak. PCTC received 5,238,210.9 shares at a par value of $10.00, which directly corresponded to the cash purchase price for each share of Amtrak's common stock.

10

32. Over the years, the actions of Amtrak have eroded the value of APU's 5,238,211 shares. This erosion of value has been gradual and continuous.

33. Over the years Amtrak has engaged in a pattern of conduct that has shifted the operations of Amtrak away from that of a private, profit-oriented business to one that operates at a deficit through the use of government subsidies so as to advance governmental objectives, such as providing passenger rail transportation at less than actual cost.

34. Many critical decisions were driven by these objectives rather than profit considerations. For example, Amtrak officials permitted political pressures to increase the number of unprofitable routes included in the basic system that Amtrak was required to operate. Unprofitable and unwise routes were initiated, expanded, and retained. Over the years, Amtrak used APU's capital to help fund these and other political and governmental objectives.

35. Amtrak includes the aforementioned government subsidies on its Consolidated Balance Sheets as debts and paid-in capital. *See* Amtrak Consolidated Financial Statements for the Years Ended September 30, 2007 and 2006, 3, 13-14 (available at http://www.amtrak.com/pdf/07financial.pdf). In addition, from 1981 to 1997, the law required Amtrak to issue to the Secretary of Transportation shares of preferred stock equal to the amount of any funds appropriated for Amtrak's use. *See* P. L. No. 97-35, § 1175, 95 Stat. 691 (1981), *amended by* P. L. 105-134, § 415(a), 111 Stat. 2570 (1997). This preferred stock is also carried on Amtrak's Consolidated Balance Sheets as a liability.

11

36. These and other actions also gradually eroded the value of APU's shares. In January 2008 this gradual and continuous erosion stabilized to the point that a claim arose and this lawsuit became ripe.

37. The stabilizing event occurred in January 2008 when Amtrak ended negotiations for redemption of APU's shares by refusing to discuss real estate and other transactions as a means of providing fair value for APU's shares, and communicated that it saw no basis for transcending its view that APU shares were essentially worthless. Amtrak effectively ended years of good faith negotiations and reverted to its position that the APU's shares essentially held no value.

38. The negotiations between APU and Amtrak over the value of the stock, which ended in January 2008, were triggered by the Amtrak Reform and Accountability Act of 1997. The Reform Act attempted to shift Amtrak's focus and orientation back toward profitability. It expressly contemplated that Amtrak would run without federal operating subsidies by December 2002.

39. The Reform Act also gave Amtrak greater freedom to make business decisions. For example, the law repealed a requirement that had locked Amtrak into a route structure established in 1971 and allowed Amtrak to eliminate routes after providing 180 days' notice. That change was intended to let Amtrak cut money-losing routes that were draining its resources. The Reform Act also permitted Amtrak to renegotiate certain onerous labor restrictions.

40. Regardless, Amtrak failed to take advantage of the cost-saving measures authorized in the Reform Act. As an example, when its chief executive officer

12

attempted to negotiate new labor agreements that would give the company greater flexibility in reducing costs, Amtrak's board forced him out of office. In addition, Amtrak did not take advantage of the removal of the statutory prohibition on contracting out work to other businesses that could have operated more efficiently. Amtrak's failure to take advantage of the foregoing cost-cutting measures is, of course, irrational when viewed from the perspective of a business supposedly being operated for profit.

41. Most pertinent to this lawsuit, the Reform Act recognized that the manner in which Amtrak was being operated and the existing capital structure of Amtrak were inefficient and unfair to the common shareholders that had "helped provide Amtrak with its initial capital." H.R. Rep. No. 105-251. Consequently, Congress provided in section 415(b) of the Reform Act that "Amtrak *shall*, before October 1, 2002, redeem all common stock previously issued, for the fair market value of such stock" (emphasis added).

42. This language in the Reform Act reasonably caused APU to believe that the gradual erosion of its property would not lead to the point of being a total and, therefore, unconstitutional taking. Indeed, APU believed based on the Reform Act that the erosion to the value of its property might even be reversed.

43. In response to Congress' mandate that Amtrak redeem the common stock for fair market value, Amtrak offered to redeem the common stock for $.03 per share. This offer lacked adequate analysis and supporting documentation. It is an amount far below the fair market value of the common stock APU owns.

13

44. Accordingly, APU and the other common shareholders rejected Amtrak's *de minimis* offer in a letter dated November 2, 2000. APU, however, continued to negotiate with Amtrak, pointing to the statutory requirements that it be given fair market value.

45. Congress subsequently expressed its impatience with Amtrak and urged Amtrak to negotiate in good faith. The conference report accompanying the 2005 omnibus spending bill stated as follows:

*Amtrak common stock redemption.*—The Amtrak Reform and Accountability Act of 1997 ... directed Amtrak to redeem all common stock at fair market value by October 1, 2002 in order to rid Amtrak of certain of its financial encumbrances so that Amtrak could position itself to seek and receive investor funds and other private financing. The date of the mandated redemption has passed, the redemption has not occurred, and the parties are not engaged in resolving the matter of evaluation of such stock at Fair Market Value, thwarting clear Congressional intent. The conferees urge these parties to resolve this matter expeditiously.

H.R. Rep. No. 108-792, at 1421 (Conf. Rep. 2004).

46. Between 2004 and 2007, APU and Amtrak reacted to this expression of Congressional intent by continuing their efforts to reach an amicable resolution of the impasse over stock value. In this timeframe, senior officers and board members of APU and Amtrak met several times in Washington, D.C. and Texas. APU and Amtrak negotiated in earnest, discussing a number of possible resolutions, each of which would result in APU receiving constitutional value for its Amtrak shares. Some of the approaches discussed were a transfer of the shares to Amtrak in exchange for tax credits; the transfer of the shares to Amtrak in exchange for the right to manage and receive income from certain of Amtrak's sub-surface and other

easements; the transfer of the shares to Amtrak as part of a larger transaction or

series of transactions that would give APU the right to develop real estate and other

assets owned by Amtrak. To facilitate these discussions, the parties--after months

of negotiations over terms--finally entered into a Confidentially Agreement on

November 1, 2007, so that they could exchange proprietary information and discuss

potential business transactions involving the shares that would generate value

sufficient to satisfy Congress' mandate and the Constitution. Indeed, the recital

clauses of the Confidentiality Agreement confirm this intent:

**WHEREAS,** Amtrak was directed pursuant to the Amtrak Reform and
Accountability Act of 1997 to redeem its common stock and the parties have
previously engaged unsuccessfully in discussions concerning redemption of
the shares of common stock held by APU; and

**WHEREAS,** APU has recently approached Amtrak to explore the Parties'
interests in business opportunities which may include redemption of all or
part of APU's shares of Amtrak common stock, and

**WHEREAS,** for the purpose of discussing and evaluating potential business
opportunities between the parties, Amtrak and APU have determined to
establish terms governing the use and protection of certain confidential and
proprietary information of Amtrak and APU.

47. In January 2008 Amtrak informed APU that it saw no point to continuing

discussions over any business transaction between APU and Amtrak that involved

redemption of the shares. Amtrak made clear the reason for refusing to combine

the redemption with some other transaction was that the shares were worthless

and that their lack of value could not be transcended or elided by being made part of

another deal.

15

48. Three consequences flow from Amtrak's decision to declare its common

shares held by APU worthless and to terminate discussions of a transaction that

would involve ascribing value to the stock that is fair, just and constitutionally

sufficient. The first is that by refusing to discuss ways to redeem the stock at a

higher than virtually zero value, Amtrak stabilized its continuing erosion of APU's

property and completed the taking, all in violation of the Takings Clause of the

Fifth Amendment. The second consequence is that Amtrak unequivocally

repudiated its Congressionally-imposed obligation to redeem APU's common shares

at fair market value. The third is that Amtrak has repudiated the agreement by

which APU was induced to contribute $52 million in capital to Amtrak.

49. Pursuant to RPSA, when Amtrak cannot reach an agreement with the owner

on the purchase price for an interest in property, Amtrak may commence eminent

domain proceedings to acquire the interest in the relevant property and an amount

of money estimated to be just compensation must be deposited with an appropriate

court, defined as the District Court in which the property is located. 49 U.S.C. §

24311. Because section 415(b) of the Amtrak Reform and Accountability Act of 1997

required Amtrak to redeem common shares at fair market value – in other words, to

re-acquire common shareholders' interests – Amtrak *was required* to commence

eminent domain proceedings pursuant to RPSA after Amtrak and APU could not

reach an agreement on fair market value. Those proceedings had to be initiated in

this District Court because the APU shares are located in this District.

50. To date, Amtrak has ignored the statutory directives of section 415(b) of the Amtrak Reform and Accountability Act of 1997 and has not commenced eminent domain proceedings pursuant to RPSA.

## IN THE ALTERNATIVE, IF ITS AMTRAK COMMON STOCK IS NOT REDEEMED AT FAIR MARKET VALUE, APU IS ENTITLED TO RESTITUTION

51. By refusing, in January 2008, to discuss any further a fair redemption price for the shares, Amtrak has repudiated the terms and conditions of the agreement under which APU paid $52 million for 5,238,211 shares of Amtrak common stock. The terms of this contract included, *inter alia*, that Amtrak would be operated as a private, for-profit corporation.

52. Instead of being operated for the benefit of and in order to maximize the investment of private shareholders like APU, Amtrak has been operated to achieve broad governmental objectives such as providing an extensive, subsidized rail passenger system.

53. Even though Amtrak has been focused on meeting the governmental objectives of providing subsidized public rail passenger service, Congress assured that the original contract between APU and Amtrak would be honored. As stated above the terms of that contract were, *inter alia*, that APU would help capitalize Amtrak and, in exchange, Amtrak would be operated as a private, for-profit business, thereby giving APU the possibility of a reasonable return on its investment.

54. Congress protected the common stockholders of Amtrak and the sanctity of the contract between them and Amtrak by requiring Amtrak, in Section 415(b) of

17

the Reform Act, to redeem the common stock at fair market value. Amtrak's refusal to do so denies APU the benefit of its bargain with Amtrak and effectively repudiates the contract between Amtrak and APU. Given this repudiation, APU is entitled to restitution: equity and justice require Amtrak to return APU's \$52 million with interest and APU to return to Amtrak the 5,238,211 shares of Amtrak common stock.

## AMTRAK'S FAILURE TO REDEEM APU'S AMTRAK COMMON STOCK AT FAIR MARKET VALUE ALSO CONSTITUTES CONVERSION OF APU'S PROPERTY

55. Section 415(b) of the Amtrak Reform and Accountability Act of 1997 created for APU's benefit a property interest in APU's right to have Amtrak redeem the common stock held by APU at fair market value no later than October 1, 2002.

56. The property interest created thereby was of real and substantial value to APU, as Congress intended Amtrak to honor the intent and spirit of RPSA and the agreements between the parties by paying Amtrak common stockholders fair market value for their shares.

57. Through its failure to redeem APU's common stock at fair market value and its persistent refusal to even negotiate a fair redemption price for APU's common stock, Amtrak has intentionally, recklessly, and/or negligently extinguished the possibility that APU will receive the compensation mandated by Congress, and thereby converted APU's capital contribution to Amtrak.

58. Moreover, because Amtrak common stock is not traded on an open market and the only reasonably likely means of disposition by APU of its Amtrak common stock is through redemption by Amtrak, Amtrak's failure to fulfill its mandate

18

under section 415(b) has also effectively destroyed or substantially interfered with APU's property rights in its Amtrak common stock.

59. Finally, Amtrak has converted APU's capital contribution of $52 million because it did not use this capital in a for-profit enterprise as promised. Instead, Amtrak used APU's capital to advance public, governmental objectives. In other words, Amtrak converted APU's private equity to further its own public objectives.

## FIRST CLAIM FOR RELIEF
### (VIOLATION OF THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES)

60. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

61. Amtrak is bound by the restrictions of the Takings Clause of the Fifth Amendment of the United States Constitution. Accordingly, Amtrak may not take private property without just compensation.

62. Amtrak has violated this provision of the Fifth Amendment by causing the value of APU's 5,238,211 shares of common stock to be completely eroded.

63. Given this violation of the Constitution, the Court should order Amtrak to pay to APU just compensation for the value of the property eroded and taken, in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (RESTITUTION)

64. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

65. APU paid $52 million in capital into Amtrak. In exchange Amtrak promised to manage and operate as a for-profit company. This exchange was the essence of the bargain between APU and Amtrak.

66. Amtrak has repudiated its contract with APU by operating not to make a profit but instead to achieve broad public and government objectives. APU has now been deprived of the possibility of receiving any return on its $52 million capital contribution to Amtrak. APU is thus entitled to restitution from Amtrak of the amount that it paid for the stock, plus interest.

## THIRD CLAIM FOR RELIEF
### (CONVERSION)

67. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

68. APU enjoyed a property interest in the mandate set forth in section 415(b) of the Amtrak Reform and Accountability Act of 1997 that Amtrak would redeem all shares of common stock at fair market value. APU also enjoyed a property interest in the $52 million it paid to Amtrak on the promise that Amtrak was going to operate as a private, for-profit corporation.

20

69. By failing to comply with the requirement of section 415(b), Amtrak has intentionally, recklessly, and/or negligently failed to redeem APU's Amtrak common stock, and has thus converted APU's property interest.

70. Amtrak has also converted APU's capital because it did not use that capital in a for-profit enterprise as promised, but instead used APU's capital to advance public, governmental objectives. In short, Amtrak converted APU's private equity to further its own public objectives.

71. As a result of these conversions, APU has sustained damages.

FOURTH CLAIM FOR RELIEF
(DECLARATORY JUDGMENT THAT AMTRAK'S INTERPRETATION AND/OR
IMPLEMENTATION OF SECTION 415(b) OF THE AMTRAK REFORM AND ACCOUNTABILITY
ACT OF 1997 VIOLATES THE DUE PROCESS CLAUSE
OF THE CONSTITUTION OF THE UNITED STATES)

72. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

73. APU is entitled to due process of law in connection with the valuation of its common shares pursuant to section 415(b) of the Amtrak Reform and Accountability Act of 1997.

74. APU has not been afforded such due process in that Amtrak has interpreted and/or implemented section 415(b) of the Amtrak Reform and Accountability Act of 1997 in such a way that deprives APU of any process whatsoever. Due process requires a fair, neutral process with APU receiving notice and an opportunity to be heard.

21

75. Indeed, Amtrak's apparent interpretation and/or implementation of section 415(b) of the Amtrak Reform and Accountability Act of 1997 is contrary to RPSA, which provides for an eminent domain proceeding along fixed parameters where Amtrak cannot reach an agreement regarding the purchase price of property with the owners of said property.

76. As a result of Amtrak's erroneous and irrational interpretation and/or implementation of section 415(b) of the Amtrak Reform and Accountability Act of 1997, APU has been denied due process of law in violation of the Fifth Amendment to the Constitution of the United States.

77. As such, the interpretation and/or implementation of section 415(b) of the Amtrak Reform and Accountability Act of 1997, as set forth in the foregoing paragraphs, must be declared to be erroneous and unconstitutional to the extent it allows Amtrak to arrive at a determination of "fair market value" without providing for a process of valuation that is rational, fact-based and neutral. Amtrak also violated due process because it did not provide APU an opportunity to be heard.

78. Moreover, the Court should issue a declaration that, because Amtrak and APU could not agree on fair market value within the time fixed by the Amtrak Reform and Accountability Act of 1997, Amtrak should have commenced eminent domain proceedings pursuant to RPSA. As such, APU further requests that this Court conduct those eminent domain proceedings as if initiated in this Court by Amtrak in the first instance and as required by RPSA. *See* 49 U.S.C. § 24311(b)(1)

(requiring Amtrak to commence eminent domain proceedings in the judicial district in which the property is located).

79. The Court should require Amtrak to set up as a counterclaim in this action an eminent domain proceeding pursuant to RPSA .

80. Alternatively, the Court should issue a declaration finding that Amtrak's interpretation and implementation of section 415(b) of the Amtrak Reform and Accountability Act of 1997 requires it to provide APU with the fair market value of its common shares in an amount the Court deems to be appropriate and just.

### FIFTH CLAIM FOR RELIEF
### (DAMAGES FOR VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES)

81. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

82. APU is entitled to procedural due process of law in connection with the valuation of its common shares pursuant to section 415(b) of the Amtrak Reform and Accountability Act of 1997.

83. Procedural due process requires APU's shares be valued through a fair, rational, fact-based process with a neutral finder of fact. APU is also entitled to receive notice and an opportunity to be heard.

84. Amtrak has violated APU's procedural due process rights as follows:

> a. Amtrak valued APU's common shares at $.03 per share and attempted to redeem them at that amount without giving APU notice nor opportunity to be heard in connection with the valuation;

23

b. Amtrak did not employ a fair process in connection with its valuation of APU's shares at $.03 per share;

c. The process Amtrak used to value APU's shares at $.03 per share was arbitrary and capricious since it was not based on any recognized valuation standards or norms and no record or analysis of how value was determined was provided or offered to APU;

d. Amtrak's process to attempt to redeem APU shares and value them at $.03 per share did not use a neutral finder of fact, but rather Amtrak made the determinations on value itself in its own interest.

85. APU has been damaged as a result of the denial of its procedural due process rights and is entitled to damages from Amtrak in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
## (DAMAGES FOR VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES)

86. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

87. APU is entitled to substantive due process of law in connection with the attempted redemption and valuation of its common shares pursuant to section 415(b) of the Amtrak Reform and Accountability Act of 1997.

88. Substantive due process requires that Amtrak place a fair value on APU's shares.

89. Amtrak has violated APU's substantive due process rights because Amtrak did not place a fair value on APU's shares and instead valued APU's shares at

24

essentially zero. Amtrak's valuation of APU's shares at essentially zero was arbitrary and capricious since it is not based on any recognized method of valuation and is an amount that is not fair.

90. APU has been damaged as a result of the denial of its substantive due process rights and is entitled to damages from Amtrak in an amount to be determined at trial.

.

### SEVENTH CLAIM FOR RELIEF (VIOLATION OF SECTION 415(b) OF THE AMTRAK REFORM AND ACCOUNTABILITY ACT OF 1997)

91. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

92. Amtrak was obligated under section 415(b) of the Amtrak Reform and Accountability Act of 1997 to redeem APU's common stock for fair market value.

93. Amtrak violated this obligation by unilaterally and erroneously valuing the common stock as worth "zero or nearly zero" and continually failing to offer APU fair market value for the common stock.

94. Congress intended APU and other Amtrak common stock owners to enforce section 415(b) through private actions against Amtrak, and no other remedy exists under federal law to recover from Amtrak.

95. Because of Amtrak's failure to comply with section 415(b), APU has suffered damages in the amount of the fair market value it was due from Amtrak's statutorily mandated redemption of APU's common stock.

**WHEREFORE**, APU and AFG demand the following relief:

A. On Count I, judgment against Amtrak in an amount to be determined at trial as just compensation for the taking of APU's private property;

B. On Count II, judgment that Amtrak return to APU the $52 million originally paid to Amtrak, plus interest, and that APU return to Amtrak its 5,238,211 shares of common stock;

C. On Count III, judgment against Amtrak in an amount of damages to be determined at trial;

D. On Count IV, a declaration that Amtrak has violated APU's due process rights and judgment in eminent domain awarding APU the fair market value of its Amtrak shares;

E. On Count V, judgment against Amtrak in an amount of damages to be determined at trial;

F. On Count VI, judgment against Amtrak requiring Amtrak to redeem APU's Amtrak stock at fair market value by a date certain and that the Court retain jurisdiction to resolve any dispute as to that value;

G. On Count VII, judgment against Amtrak in an amount of damages to be determined at trial;

H. An award from Amtrak of APU's expenses in bringing this action, including reasonable attorneys' fees, costs and expenses;

I. Such other relief as the Court finds just and proper.

Nathaniel R. Jones (0026866)
Michael L. Cioffi (0031098)
BLANK ROME LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
513-362-8701
Fax: 513-362-8702
Email: Jones-N@BlankRome.com
        Cioffi@BlankRome.com

Trial Attorneys for Plaintiffs American
Premier Underwriters, Inc. and American
Financial Group, Inc.


Matthew J. Siembieda
Timothy D. Katsiff
BLANK ROME LLP
One Logan Square
Philadelphia, PA   19103
215-569-5500
Fax:  215-569-5546
Email: Siembieda@BlankRome.com
        Katsiff@BlankRome.com


Alex Blanton
BLANK ROME LLP
Watergate
600 New Hampshire Ave., NW
Washington, DC 20037
202-772-5909
Fax:  202-572-8357
Email: Blanton@BlankRome.com

Counsel for Plaintiffs American Premier
Underwriters, Inc. and American
Financial Group, Inc.