UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AMERICAN PREMIER UNDERWRITERS, :
INC., et al.,                     :   NO. 1:08-CV-00346
                                  :
        Plaintiffs,               :
                                  :
                                  :   **OPINION AND ORDER**
    v.                            :
                                  :
                                  :
NATIONAL RAILROAD PASSENGER        :
CORPORATION,                      :
                                  :
        Defendant.                :


        This matter is before the Court on Defendant's Motion to
Dismiss Plaintiffs' Complaint (doc. 58), Plaintiffs' response in
opposition thereto (doc. 64), and Defendant's reply in support
thereof (doc. 65).  For the following reasons, the Court GRANTS
Defendant's motion.

**I.  Background**

        In response to the failing passenger rail service
industry, Congress enacted the Rail Passenger Service Act of 1970
("RPSA"), Pub. L. No. 91-518, 84 Stat. 1327, which created the
National Railroad Passenger Corporation, known as Amtrak.  Amtrak
was to be a private corporation designed to "meet the Nation's
intercity passenger transportation requirements." RPSA § 301.  The
RPSA outlined a procedure by which railroads could choose to obtain
relief from their passenger service obligations by entering into

contracts with Amtrak. "In consideration of being relieved of this responsibility by [Amtrak]," a participating railroad would pay Amtrak an amount equal to half of that railroad's losses from intercity passenger service during 1969, and provide Amtrak with the use of tracks, facilities, and services. RPSA §§ 401(a)(2), 402. A participating railroad could elect to receive either a tax deduction or common stock of Amtrak in an amount equal to its payment. RPSA §§ 401(a)(2), 901.

In June 1970, American Premier Underwriters, Inc., a freight and passenger rail service company then known as Penn Central, filed for bankruptcy.[1] Plaintiffs chose to obtain relief from their passenger service obligations under the RPSA and entered into an agreement with Amtrak, dated April 16, 1971 ("Basic Agreement"). Under the Basic Agreement, Plaintiffs were to contribute half of their 1969 passenger service losses, approximately $52 million, to Amtrak, and Amtrak would relieve Plaintiffs of their responsibility for the provision of Intercity Rail Passenger Service. As provided by the RPSA, Plaintiffs elected to take approximately five million shares of Amtrak common stock and received a seat on Amtrak's board of directors in 1971. The Basic Agreement had a fixed term, becoming effective on May 1,

---

[1] The other plaintiff in this matter is American Financial Group, Inc., APU's parent company and the beneficial owner of the stock at issue (doc. 1). For ease of reading, the Court will refer at all times to the plaintiffs as "Plaintiffs," regardless of which plaintiff took or was affected by the action at issue.

1971 and terminating on April 30, 1996. No provision of the Basic Agreement provided for stock redemption. "In consideration of its being relieved by [Amtrak] of its entire responsibility for the provision of Intercity Rail Passenger Service, Railroad shall pay [Amtrak] $52,382,109, being an amount equal to fifty per centum of Railroad's fully distributed passenger service deficit for the year ending December 31, 1969" to be paid in cash in 36 monthly installments. After the payments were completed, Amtrak issued Plaintiffs one share of Common Stock for each ten dollars of the amount paid or satisfied, such shares to be memorialized by corresponding certificates. The Basic Agreement was made by and between Amtrak and the trustees of the property of Penn Central Transportation Company.

In 1978, in connection with Plaintiffs' reorganization under the Bankruptcy Code, Plaintiffs and Defendant entered into a Settlement Agreement which provided that "[a]ll claims by Amtrak against Penn Central, and all claims by Penn Central against Amtrak, will be liquidated, extinguished and settled, as part of the consummation of a plan of Penn Central." The Settlement Agreement further provided that "all rights and obligations [between the parties] arising out of or based upon the agreements listed below are released, and Penn Central and Amtrak hereby agree never more to assert against each other any claim based on such rights or obligations."

-3-

In 1997, Congress enacted the Amtrak Reform Act of 1997, Pub. L. No. 105-134, 111 Stat. 2570 (the "1997 Act"), and in section 415(b) provided that "Amtrak shall, before October 1, 2002, redeem all common stock previously issued, for the fair market value of such stock." Negotiations between the parties were held beginning in 2000, and Amtrak initially offered Plaintiffs a price of $.03 per share. This offer was rejected by Plaintiffs and negotiations continued until January 2008, when Amtrak informed Plaintiffs that it would not consider any alternative transaction—such as the transfer of real estate or other Amtrak assets in exchange for the stock. The stock remains unredeemed, in derogation of the mandate set forth in 1997 Act.

Plaintiffs' complaint contains the following claims: (1) Amtrak violated the Takings Clause of the Fifth Amendment when it caused the value of Plaintiffs' shares of common stock "to be completely eroded"; (2) Plaintiffs are entitled to restitution for the amount they paid for their stock, plus interest, because "Amtrak repudiated its contract...by operating not to make a profit but instead to achieve broad public and government objectives" despite "promis[ing] to manage and operate as a for-profit company"; (3) by failing to redeem Plaintiffs' stock for fair market value, as required by statute, Amtrak converted Plaintiffs' property interest in the $52 Million Plaintiffs paid for the stock and converted that capital because it did not use it for a for-

-4-

profit enterprise but, instead, for public, governmental objectives; (4) & (5) Plaintiffs were denied procedural due process in violation of the Fifth Amendment when Amtrak valued Plaintiffs' shares at $.03 each without providing for a "rational, fact-based and neutral" valuation process; (6) Plaintiffs were denied substantive due process in violation of the Fifth Amendment when Amtrak valued Plaintiffs' shares at "essentially zero" and such valuation was "arbitrary and capricious since it is not based on any recognized method of valuation and is an amount that is not fair"; and (7) Amtrak violated Section 415(b) of the Amtrak Reform and Accountability Act of 1997 when it "unilaterally and erroneously" valued Plaintiffs' shares at "zero or nearly zero" and failed to offer fair market value for the stock.  Amtrak moves the Court to dismiss Plaintiffs' complaint in its entirety.

## II.  The Applicable Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) requires the Court to determine whether a cognizable claim has been pled in the complaint.  The basic federal pleading requirement is contained in Fed. R. Civ. P. 8(a), which requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976); Erickson v. Pardus, 551 U.S. 89 (2007).  In its scrutiny of the complaint, the Court must construe all well-pleaded facts liberally in favor of

the party opposing the motion.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  A complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Courie v. Alcoa Wheel & Forged Products, 577 F.3d 625, 629-30 (6th Cir. 2009), quoting Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009), citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

A motion to dismiss is therefore a vehicle to screen out those cases that are impossible as well as those that are implausible.  Courie, 577 F.3d at 629-30, citing Robert G. Bone, *Twombly, Pleading Rules, and the Regulation of Court Access*, 94 IOWA L. REV. 873, 887-90 (2009).  A claim is facially plausible when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the conduct alleged.  Iqbal, 129 S.Ct. at 1949.  Plausibility falls somewhere between probability and possibility.  Id., citing Twombly, 550 U.S. at 557.  As the Supreme Court explained,

> "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 1950.

The admonishment to construe the plaintiff's claim liberally when evaluating a motion to dismiss does not relieve a

plaintiff of his obligation to satisfy federal notice pleading requirements and allege more than bare assertions of legal conclusions. Wright, Miller & Cooper, Federal Practice and Procedure: § 1357 at 596 (1969). "In practice, a complaint . . . must contain either direct or inferential allegations respecting all of the material elements [in order] to sustain a recovery under some viable legal theory." <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1106 (7th Cir. 1984), quoting <u>In Re: Plywood Antitrust Litigation</u>, 655 F.2d 627, 641 (5th Cir. 1981); Wright, Miller & Cooper, Federal Practice and Procedure, § 1216 at 121-23 (1969). The United States Court of Appeals for the Sixth Circuit clarified the threshold set for a Rule 12(b)(6) dismissal:

> [W]e are not holding the pleader to an impossibly high standard; we recognize the policies behind Rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

<u>Scheid v. Fanny Farmer Candy Shops, Inc.</u>, 859 F.2d 434, 437 (6th Cir. 1988).

## III. The State Law Claims

### A.    Release and the Statute of Limitations

As an initial matter, Amtrak asserts that all of Plaintiffs' claims were released by the 1978 Settlement Agreement and that the claims are subject to a three-year statute of

limitations, which means that Plaintiffs' claims are barred as untimely (doc. 58).  As to these global issues of release under the Settlement Agreement and the statute of limitations, Plaintiffs contend that the releases contained in the 1978 Settlement Agreement cannot serve to preclude Plaintiffs' claims now because the claims had not accrued at the time of execution of that agreement (doc. 64).  Specifically, Plaintiffs note that the Settlement Agreement released "claims or causes of action of any sort whatsoever...arising or accruing from the beginning of the world through and including March 31, 1976," and Plaintiffs could not have known by March 31, 1976 that Congress would, in 1997, require Amtrak to redeem its shares at fair market value and that, despite that requirement, Amtrak would refuse to do so and would not afford Plaintiffs an opportunity to be heard before deciding on a value of $.03 per share (Id.).

Further, Plaintiffs argue that granting Amtrak's motion to dismiss on the basis that Plaintiffs released all claims in 1978 would be to ignore the factual assertions made in Plaintiffs' complaint, which the Court cannot do at this stage in the proceedings.  Specifically, Plaintiffs note that Amtrak asserts that the shares' lack of value was established by the date of the Settlement Agreement, while Plaintiffs allege in their complaint that it was not until Amtrak offered the $.03 per share and then made the decision to end negotiations on the congressionally-

mandated redemption at fair market value that Plaintiffs' injury with respect to the value of the shares became known and actionable.

The Court finds that Plaintiffs' claims are not time-barred, inasmuch as they relate to the question of the value of the shares, because the value of the shares and, should they be found to be worthless, the point in time at which their value was depleted to essentially zero, are factual questions that would require a fuller evidentiary record to answer. Resolving them on a motion to dismiss is improper. See, e.g., Firestone v. Firestone, 76 F.3d 1205, 1208-09 (D.C. Cir. 1996)("[C]ourts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint.").

With respect to the releases contained in the Settlement Agreement, the Court finds them inapplicable to this action. Plaintiffs did indisputably release any and all claims arising or accruing through March 31, 1976, and all claims "arising from acts, omissions or conditions which occurred or commenced on or before March 31, 1976." However, Plaintiffs are not seeking redress for such claims. Instead, they seek redress for claims that arise out of Amtrak's failure to redeem Plaintiffs' shares at fair market value, something Amtrak was statutorily obligated to do in 1997. To read that statutory obligation to be one that arose out of acts, omissions or conditions occurring or commencing before March 31,

1976, is a reading this Court cannot subscribe to.  Such a reading of the release language and the facts before the Court is far too sweeping.  Plaintiffs cannot be held to have known that the statutory obligation at issue would be imposed on Amtrak some 19 years after signing the release and certainly cannot be held to have released any claim arising from Amtrak's failure to abide by that then-unknown and unforeseeable obligation.

The Court further notes that Amtrak argues globally that the National Arbitration Panel's decision on whether the parties were required to arbitrate these claims has a preclusive effect on this matter and that its motion to dismiss should be granted accordingly.  However, as Plaintiffs point out, the NAP expressly did not reach the merits of this case and did not address Amtrak's motion to dismiss.  The Court sees nothing in the NAP's decision that the parties were not required to arbitrate that would bind the Court on the issues raised in Amtrak's motion to dismiss.

**B.    The Restitution Claim**

Plaintiffs seek restitution for the amount they paid for their stock, plus interest, because "Amtrak repudiated its contract...by operating not to make a profit but instead to achieve broad public and government objectives" despite "promis[ing] to manage and operate as a for-profit company" (doc. 1). Specifically, Plaintiffs assert that Amtrak's retention of the $52 million that Plaintiffs paid for their Amtrak stock, which,

Plaintiffs assert, Amtrak has used for the benefit of the public, amounts to Amtrak being unjustly enriched. Plaintiffs contend that they are entitled to recover on an unjust enrichment theory any loss of their initial capital contribution resulting from Amtrak not honoring its statutory obligation to operate as a for-profit corporation and to redeem Plaintiffs' shares at fair market value (doc. 64).

Amtrak argues that Plaintiffs have failed to state a claim for unjust enrichment because, as a matter of law, one cannot exist under these circumstances. Specifically, Amtrak argues that because Plaintiffs received the benefit of their bargain when they bought their Amtrak shares, they cannot now claim that Amtrak was unjustly enriched (doc. 58). Amtrak notes that, in exchange for the $52 million investment made by Plaintiffs, they were relieved of the costly obligation to provide passenger rail service. This, Amtrak contends, cannot be seen to be unjust. In addition, Amtrak notes that Plaintiffs would need to relinquish the consideration it received in exchange for its investment and would need, therefore, to reassume passenger rail service and reimburse Amtrak for Amtrak's losses that it incurred while providing passenger rail service over the years.

The Court finds that Plaintiffs have failed to state a claim for relief under an unjust enrichment theory, and Amtrak is therefore entitled to dismissal of this claim. Plaintiffs'

position appears to be that they seek restitution for the promises
that flowed from Amtrak's commitment to run as a for-profit company
and from Congress' mandate that Amtrak redeem Plaintiffs' shares at
a fair market rate, and not from promises made in the parties'
original contract.   In short, to survive Amtrak's motion to
dismiss, Plaintiffs ask the Court to find that they have alleged
sufficient facts from which the Court could plausibly infer that a
quasi-contract arose by virtue of Amtrak's structure as a for-
profit corporation and/or by virtue of Congress' directive that
Amtrak redeem Plaintiffs' shares.   <u>See</u>, <u>e.g.</u>, <u>4934, Inc. v.
District of Columbia Dept. of Employment Svcs.</u>, 605 A.2d 50, 55
(D.C. 1992)(observing that unjust enrichment and restitution arise
from the common law where, in the absence of an actual contract,
courts created a quasi-contract, a legal fiction 'where
circumstances are such that justice warrants a recovery as though
there had been a promise')(citations omitted).

        Plaintiffs have simply not met that burden.   First, with
respect to the issue of Amtrak being organized as a for-profit
corporation but not making a profit for its shareholders, it is not
disputed that Amtrak made a promise to manage and operate as a for-
profit company, but this is in no way a guarantee that the
company's shareholders will experience a profit, and Plaintiffs,
sophisticated investors that they are, know this well.   Such a
promise cannot possibly–let alone plausibly–form the basis of an

-12-

unjust enrichment claim. With respect to Plaintiffs' theory that Amtrak made a contract-like promise to redeem Plaintiffs' shares when Congress imposed the statutory duty on it to do so, the Court finds the theory too attenuated to plausibly present a claim for unjust enrichment. Here it is not "justice that warrants a recovery," it is, arguably, congressional action. Amtrak did nothing from which a promise could be imputed; on the contrary, it was a passive object of Congress' act. Therefore, unjust enrichment cannot provide Plaintiffs with an avenue for relief under the facts alleged in their complaint; Amtrak is entitled to a dismissal of Plaintiffs' restitution claim because, even accepting all of the factual allegations in the complaint as true, Plaintiffs have failed to state a plausible claim for relief.

### C. The Conversion Claim

Plaintiffs claim that, by failing to redeem Plaintiffs' stock for fair market value as required by statute, Amtrak converted Plaintiffs' property interest in their stock shares (doc. 1). Plaintiffs argue that because their stock isn't traded on the open market, Amtrak's decision to not redeem the stock amounts to a conversion because that decision places Amtrak in a position of dominion or control over Plaintiffs' rights (doc. 64, citing Ficken v. AMR Corp., 578 F.Supp.2d 134, 143 (D. D.C. 2008) for the proposition that intangible property rights that are identified by a tangible document can be converted).

-13-

Plaintiffs' conversion claim cannot survive Amtrak's motion for the simple reason that they have failed to allege a critical element of the cause of action.  Specifically, as Amtrak notes, in order for a conversion claim for an intangible benefit to lie, the tangible document representing the intangible property right must itself be converted.  Indeed, the case relied on by Plaintiffs to establish that certain intangible rights can be converted is clear about this.  <u>See</u> <u>Ficken</u>, 578 F.Supp.2d at 143 ("Conversion and trover extend only to intangible rights identified <u>by a tangible document that is converted</u>; 'thus a plaintiff may bring suit for conversion of a promissory note, a check, a bank book, or an insurance policy...but not for conversion of a debt, the good will of a business or an idea.'")(emphasis added).

Here, if the property right Plaintiffs allege Amtrak converted is a property right created by the congressional mandate that Amtrak redeem Plaintiffs' shares, the claim fails because that right is indisputably intangible and not represented by any kind of tangible document.  It thus falls on the debt/good will/idea end of the spectrum and not on the promissory note/check/bank book end and is therefore not subject to a conversion claim.  To the extent Plaintiffs are claiming that Amtrak converted their property interest in their stock because the stock can't be traded on the open market, and Amtrak has not yet redeemed the stock, the claim similarly fails because Plaintiffs have not alleged that Amtrak

-14-

converted the tangible document representing the intangible right, i.e., the stock certificates.  As noted above, that is a critical component of a successful claim for conversion of intangible rights-the tangible document representing those rights must be converted.

Plaintiffs have failed to set forth sufficient allegations for a plausible claim for relief under a conversion theory, and Amtrak is therefore entitled to dismissal of that claim.

**IV.  The Constitutional Claims**

> **A.  Plaintiffs' First, Fifth and Sixth Claims (Takings Clause and Due Process Clause)**

Plaintiffs contend that Amtrak violated the Takings Clause of the Fifth Amendment when it caused the value of Plaintiffs' shares of common stock "to be completely eroded" (doc. 1).  Specifically, Plaintiffs allege that Amtrak has, over a course of years, shifted its operations from being private and profit-oriented to being run at a deficit through the use of government subsidies to advance the government objective of providing passenger rail service at below cost (Id.).  Additionally, Plaintiffs allege that Amtrak used Plaintiffs' capital to fund political and government objectives, such as increasing the number of unprofitable routes, rather than to increase Amtrak's profit and, thus, the value of Plaintiffs' shares.

After years of discussions over the terms by which Amtrak would redeem Plaintiffs' shares, as it was congressionally mandated to do by the Amtrak Reform and Accountability Act of 1997, Amtrak put an end to the negotiations in January 2008 when it declared, according to the complaint, that the shares were worthless and their lack of value could not be obscured by becoming part of another deal. Plaintiffs assert that Amtrak's decision to declare the shares worthless and withdraw from negotiations premised on a fair-market valuation of the shares completed the unconstitutional taking of Plaintiffs' investment in violation of the Fifth Amendment.

With respect to the Takings Clause claim, Amtrak contends that Congress has not created a cause of action against Amtrak for violations of the Fifth Amendment, and the Supreme Court has held that direct constitutional damages claims against federal agencies are not available (Id., citing Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 397 (1971); F.D.I.C. v. Meyer, 510 U.S. 471, 486 (1994)).

In response, Plaintiffs contend that Bivens and Meyer are inapplicable in this context because the Supreme Court expressly held that Amtrak could be sued directly for constitutional violations, albeit in the First Amendment context (doc. 64, citing Lebron v. National Railroad Passenger Corp., 513 U.S. 374, 394 (1995)).

As Amtrak notes, suits seeking damages from federal agencies are not permitted under <u>Bivens</u>.  See <u>Meyer</u>, 510 U.S. 471 ("An extension of <u>Bivens</u> [from agents] to agencies of the Federal Government is not supported by the logic of <u>Bivens</u> itself.").  Plaintiffs point to <u>Lebron</u>, which was decided after <u>Meyer</u>, for the proposition that, because <u>Lebron</u> permitted a First Amendment suit against Amtrak, a suit alleging violations of other constitutional rights against Amtrak should similarly be allowed to proceed.  <u>See</u> <u>Lebron</u>, 513 U.S. 374.  Plaintiffs contend that <u>Meyer</u> and <u>Bivens</u> are inapplicable and argue that there is no principled reason to allow Amtrak to be sued for First Amendment violations but not violations of other constitutional provisions.

Plaintiffs have created something of a red herring here. The issue is not whether Amtrak can be sued only for violations of the First Amendment or whether it can be sued for violations of other constitutional provisions.  Instead, the issue is whether Plaintiffs may pursue their constitutional claims against Amtrak if they are seeking damages as opposed to equitable relief.  <u>Meyer</u> holds that agencies may not be sued for damages resulting from constitutional violations, and <u>Lebron</u>, which was a suit for injunctive relief, not damages, holds that Amtrak qualifies as an agency for the purpose of seeking redress of constitutional violations.  <u>See</u> <u>Meyer</u>, 510 U.S. at 486; <u>Lebron</u>, 513 U.S. at 394. The syllogism is complete only with the conclusion that, pursuant

to <u>Meyer</u>, Amtrak may not be sued for damages resulting from constitutional violations but it may, pursuant to <u>Lebron</u>, be sued for equitable relief.

With respect to their Takings cause of action in Plaintiffs' First Claim, the complaint can only reasonably be read to lodge claims for damages.  That claim asks the Court to order Amtrak to pay just compensation for the value of the property they allege has been eroded and taken, in an amount to be determined at trial.  Similarly, Plaintiffs' Due Process Clause claims articulated in their Fifth and Sixth Claims are explicitly damages claims: "[Plaintiffs have] been damaged as a result of the denial of [their] procedural [and substantive] due process rights and [are] entitled to damages from Amtrak in an amount to be determined at trial" (doc. 1).

Plaintiffs have sued Amtrak, a government agency for these purposes, for damages resulting from alleged constitutional violations.  Unfortunately for Plaintiffs, <u>Meyer</u> stands as an insurmountable obstacle to those claims because it holds that agencies may not be sued for damages.  Therefore, pursuant to <u>Meyer</u>, Amtrak is entitled to dismissal of Plaintiffs' First, Fifth and Sixth Claims.  <u>See</u> <u>Meyer</u>, 510 U.S. at 486

Plaintiffs' Due Process Clause claim articulated in their Fourth Claim, on the other hand, is more properly viewed as seeking equitable relief as they seek notice and an opportunity to be heard

on the valuation of the shares; a declaration that Amtrak's interpretation of the 1997 Act is unconstitutional and that eminent domain proceedings should commence; and a declaration that Amtrak must provide Plaintiffs with compensation in the amount deemed appropriate and just by the Court (doc. 1).  Therefore, Plaintiffs' Fourth Claim survives Amtrak's <u>Meyer</u> challenge, but, as will be discussed below, it fails for other reasons.

### B.   Plaintiffs' Fourth Claim (Due Process Clause)

#### 1.  No Private Right of Action

In their Fourth Claim for relief, Plaintiffs seek notice and an opportunity to be heard on the valuation of the shares; a declaration that Amtrak's interpretation of the 1997 Act is unconstitutional and that eminent domain proceedings should commence; and a declaration that Amtrak must provide Plaintiffs with compensation in the amount deemed appropriate and just by the Court (doc. 1).

Amtrak contends that Plaintiffs have no private right of action under the 1997 Act and no property right in redemption of its stock, which consequently means they cannot pursue a due process claim (doc. 58, citing <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 538 (1985) for the proposition that due process claims depend on the existence of a property right that is entitled to protection).  Because, according to Amtrak, the 1997 Act did not create an individually enforceable right to redemption,

the Act created no property interest and thus nothing to be implicated by the due process clause (Id.).

Plaintiffs contend that they do have an enforceable property right and that, in any event, their complaint alleges both a property right in the statutory mandate of redemption and a property right in their shares of stock (docs. 1, 64). Amtrak violated their due process rights both in their stock shares and in their right of redemption, Plaintiffs contend, by not providing a fair analysis of the stock's value (Id.).

### a.    Amtrak's Arguments

Amtrak argues that the 1997 Act does not create a private right of action because, it contends, the statute does not contain clear and unambiguous rights-creating language but it does contain an express and exclusive public enforcement mechanism, thus it cannot be inferred that Congress intended to create a private right of action (doc. 65). Amtrak asserts that the mandate that "Amtrak shall...redeem all common stock" expresses an obligation imposed on Amtrak, the regulated body, and does not, as Plaintiffs suggest, express an entitlement of the shareholders (Id.).

In addition, Amtrak contends that it, not the shareholders, was the intended beneficiary of the 1997 Act and that Congress passed the 1997 Act in order to create more options for Amtrak to obtain private financing (Id.). As support for its contention that the shareholders are not the intended beneficiaries

-20-

of the 1997 Act, Amtrak notes that Congress knew when it passed the 1997 Act that Amtrak stock was generally considered to have no market value (Id.).

Further, Amtrak notes that there is no mention of private enforcement in the legislative history of the 1997 Act, which "strongly suggests that Congress did not intend to imply a private right of action" (Id., citing Bowling Green v. Martin Land Dev. Co., 561 F.3d 556, 561 (6th Cir. 2009)).  On the contrary, Amtrak observes, the 1997 Act was enacted as part of the RPSA, which includes an express and exclusive public enforcement mechanism (Id., citing 49 U.S.C. § 24103(a)(1)(C)("[O]nly the Attorney General may bring a civil action for equitable relief in a district court of the United States when Amtrak...refuses, fails or neglects to discharge its duties and responsibilities under [Title 49, Subtitle V, Part C]").  This, Amtrak claims, indicates that Congress did not intend to create a private right of action (Id., citing Alexander v. Sandoval, 532 U.S. 275, 290 (2001)("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.")).

### b.   Plaintiffs' Arguments

Plaintiffs contend that there is nothing to support the assumption that Congress intended to deny a private right of action in the 1997 Act.  Plaintiffs argue that the use of the word "shall"–as in, "Amtrak shall...redeem all common stock"–indicates

-21-

that Congress created a right of redemption for the shareholders because "shall" is "classic individual rights-creating language" (doc. 64). Plaintiffs note that there are only four common stock shareholders, which takes the redemption mandate out of the realm of a statute that benefit the public at large through a regulatory scheme and, instead, puts it squarely in the realm of a statute creating "federal rights for the especial benefit of a class of persons" (Id., citing California v. Sierra Club, 451 U.S. 287, 297-98 (1981)).

Plaintiffs further observe that Congress did not include a governmental enforcement mechanism when it enacted the 1997 Act, and the Act does not expressly foreclose a private right of action (Id.). While Plaintiffs acknowledge that the RPSA provides that equitable actions against Amtrak may be brought only by the Attorney General, Plaintiffs argue that that RPSA provision is inapplicable to a cause of action arising from the 1997 Act because it would be illogical to expect the Attorney General to enforce the rights of four shareholders; the Attorney General enforcement provision was enacted in 1970, some 27 years before the 1997 Act; and nothing in the 1997 Act or in its legislative history suggests that Congress intended the Attorney General provision of the RPSA to apply to the 1997 Act (Id.). Plaintiffs observe that the 1997 Act only appears in the U.S. Code as a note to a section of the RPSA and argue that this indicates that the Attorney General

-22-

provision of the RPSA should not apply to the 1997 Act (Id.). Further, to the extent Plaintiffs seek monetary damages, they argue that the provision in RPSA, if found to apply to the 1997 Act, would not foreclose their private action because it applies only to equitable actions (Id.).

In addition, Plaintiffs assert that finding a private right of action in the 1997 Act is consistent with the purpose of the Act, which they characterize as allowing for Amtrak to restructure its finances (Id., citing Bender v. Jordan, 439 F.Supp. 2d 139, 159 (D.D.C. 2006), where an implied private right of action for shareholders was found where the statute at issue "was not enacted for the benefit of the issuer [but rather where] its 'sole purpose was the protection of shareholders'"). Because remedial statutes should be construed broadly, and because Congress enacted the 1997 Act because it felt that Amtrak needed significant financial reforms, Plaintiffs argue that an implied right of action should be found (Id., citing Carter v. United States, 553 F.3d 979, 985 (6th Cir. 2009), where the court found an implied private right of action in a real estate reform statute, noting the remedial nature of the statute and that Congress had recognized that significant reforms were needed in the real estate settlement process).

### c. Discussion

Cort v. Ash, 422 U.S. 66 (1975), provides the starting

point for determining whether a statute creates a private right of action. The four Cort factors are: (1) whether the plaintiff is one of the class for whose benefit the statute was enacted; (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law. Cort, 422 U.S. at 78. The Cort factors are not necessarily entitled to equal weight, however, and the "central inquiry remains whether Congress intended to create, whether expressly or by implication, a private cause of action." Touche Ross & Co. v. Redington, 442 U.S. 560, 575 (1979). Indeed, it has been argued that Touche Ross effectively overruled Cort's four-factor test by elevating "one of its four factors (congressional intent) into the determinative factor, with the other three merely indicative of its presence or absence." Thompson v. Thompson, 484 U.S. 174, 189 (1988)(Scalia, J., concurring). Further, "unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." Northwest Airlines, Inc. v. Transport Workers Union of America, 451 U.S. 77, 94 (1981).

-24-

### i.  Congressional Intent

An application of the <u>Cort</u> factors in an effort to divine congressional intent leads the Court to the conclusion that the 1997 Act did not create a private right of action for the shareholders.

To ascertain whether Congress intended to create a private right of action, the Court first turns to the text of the statute at issue.  <u>In re Carter</u>, 553 F.3d 979, 985 (6th Cir. 2009). Here, as Amtrak notes, the 1997 Act does not contain unambiguous rights-creating language.  For support, Plaintiffs turn to the phrase "Amtrak shall...redeem all common stock", arguing that "shall" is "classic individual rights-creating language".  However, as Amtrak notes, the "shall" here clearly imposes an obligation on Amtrak; it does not clearly express an entitlement of the shareholders.  Therefore it is quite unlike, for example the "classic individual rights-creating language" of the Civil Rights Act.  <u>Compare</u> the 1997 Act, "Amtrak shall...redeem all common stock", <u>with</u> Titles VI and IX of the Civil Rights Act of 1964, "No person...shall...be subjected to discrimination."

Plaintiffs assert that "Section 415(b) does not focus on Amtrak as the regulated entity," and cite <u>Cenzon-Decarlo v. Mount Sinai Hospital</u>, 2010 U.S. Dist. LEXIS 3208 (E.D. Ny. Jan. 15, 2010).  <u>Cenzon-Decarlo</u> does not serve to buttress Plaintiffs' position.  In <u>Cenzon-Decarlo</u>, the Church Amendment was found to

"speak[] to the funded entity rather than to any benefitted class and, therefore, lacks the focus on individuals that would indicate the necessary congressional intent that a private right of action be implied." Id. The statute at issue read in relevant part, "No entity [receiving certain federal money] may discriminate in the employment...of any physician or other health care personnel...." Id., citing 42 U.S.C. § 300a-7(c). This arguably contains clearer "benefitted class" language than the 1997 Act, which, in the section at issue here, does not even mention the shareholders. Instead, notwithstanding Plaintiffs' assertion to the contrary, the 1997 Act speaks solely to the regulated entity, Amtrak, with no focus on individuals at all. See Section 415(b) of the 1997 Act ("Amtrak shall, before October 1, 2002, redeem all common stock previously issued, for the fair market value of such stock."). Cenzon-Decarlo, therefore, does not advance Plaintiffs' cause.

Given the absence of clear, unambiguous rights-creating language, the text of the 1997 Act does not support a finding that Congress intended to create a private right of action in favor of the shareholders. See Gonzaga Univ. v. Doe, 536 U.S. 273, 290 (2002)("[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action."). That could end the Court's analysis, but out of an abundance of caution,

the Court will consider the remaining <u>Cort</u> factors as they may demonstrate congressional intent.

> **ii.**  **Whether Plaintiffs are one of the class for whose benefit the 1997 Act was enacted**

Plaintiffs argue that because the 1997 Act mandates that Amtrak redeems all of its common shares at fair market value, and because Plaintiffs are one of only four common stock shareholders, the provision must have been enacted for the shareholders' benefit (doc. 64). They argue that because the statute was not "intended to benefit the public at large through a general regulatory scheme," it must have been enacted to "create federal rights for the especial benefit of a class of persons" (<u>Id</u>., quoting <u>California v. Sierra Club</u>, 451 U.S. 287, 297-98 (1981)).

Amtrak argues that the 1997 Act cannot be read to include Plaintiffs as one of the class for whose benefit the Act was created because the Act was expressly created to benefit Amtrak by giving it more financing options (doc. 65, H.R. Rep. Nos. 105-251 at 14 (1997) and 108-792 at 1421 (2004)). In addition, Amtrak notes that at the time Congress passed the 1997 Act, it was of the belief that Amtrak common stock was "generally considered to have no market value" (<u>Id</u>., quoting H.R. Rep. No. 105-251 at 19). Therefore, Amtrak argues, Congress could not have intended for Plaintiffs to be the beneficiaries of the Act.

The Court agrees. Although Plaintiffs would benefit if

Amtrak redeems the stock at a price acceptable to Plaintiffs, that fact does not mean that Plaintiffs were the intended beneficiaries of the Act.  Such a benefit is simply too attenuated to form the basis of a finding that Congress intended to create a private right of action with the 1997 Act.  Indeed, it could just as easily be argued that the public at large is the intended beneficiary of the Act since the public would clearly benefit if Amtrak were to become more financially viable.  What is clear and undisputed is that Congress intended to create greater financing options for Amtrak. Many people could benefit from those options, including Plaintiffs, including the public at large, including new lenders, etc.  But that does not mean that it can reasonably be inferred that Congress intended all of those people to have a private cause of action

### iii. The Purpose of the 1997 Act

Here, the Court inquires whether implying a private right of action is consistent with the underlying purposes of the legislative scheme.  <u>Cort</u>, 422 U.S. at 78.  Plaintiffs and Amtrak agree that the purpose of the 1997 Act was to allow for Amtrak to restructure its finances (docs. 58, 64).  Plaintiffs contend that finding a private right of action would be consistent with that purpose and cite <u>Bender</u>, 439 F.Supp.2d 139 for support.

In <u>Bender</u>, the court found an implied private right of action for shareholders where the statute at issue "was not enacted for the benefit of the issuer [but rather where] its 'sole purpose

-28-

was the protection of shareholders'". 439 F.Supp.2d at 159. The Court cannot see how Bender could support Plaintiffs' position here. Plaintiffs agree with Amtrak that the 1997 Act was enacted to allow Amtrak to engage in refinancing. This distinguishes the 1997 Act from the Bender statute, as the 1997 Act was clearly enacted for the benefit of Amtrak. And no reading of the 1997 Act as a whole could reasonably or even plausibly lead one to the conclusion that it was enacted with a "sole purpose" of protecting the Amtrak shareholders, again a clear distinction from Bender. On the contrary, the legislative history and the text of the 1997 Act itself demonstrate that the statute was enacted to facilitate Amtrak's financial restructuring because of congressional concerns about Amtrak's financial condition. See, e.g., H.R. Rep. No. 108-792 at 1491 (2004); H.R. Rep. No. 105-251 at 14 (1997); the 1997 Act, Pub. L. No. 105-134, 111 Stat. 2570 ("The Congress finds that...Amtrak is facing a financial crisis...[and] immediate action is required to improve Amtrak's financial condition if Amtrak is to survive....").

In addition, Plaintiffs contend that the 1997 Act is a remedial statute and argue that because remedial statutes should be construed broadly, and because Congress enacted the 1997 Act because it felt that Amtrak needed significant financial reforms, an implied right of action should be found (doc. 64, citing In re Carter, 553 F.3d 979, 985 (6th Cir. 2009)). In Carter, the court

-29-

found an implied private right of action in a real estate reform statute, noting the remedial nature of the statute and that Congress had recognized that significant reforms were needed in the real estate settlement process. In finding "little doubt" that the statute at issue was a remedial one, the <u>Carter</u> court noted that Congress specifically enacted it "to effect certain changes in the settlement process for residential real estate" that would result, in part, "in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." <u>Carter</u>, 553 F.3d at 986, quoting 12 U.S.C. § 2601(a), (b)(1). The evil that statute was meant to remedy is clearly expressed in the congressional findings.

No similar findings with respect to the 1997 Act have been presented here such that the Court would be compelled to conclude that the 1997 Act was a true remedial statute. Nonetheless, stretching the meaning of "evil," one could conclude that the evil the 1997 Act meant to remedy was Amtrak's restrictive financing structure. Construing the 1997 Act as remedial, however, does not grant Plaintiffs their ticket to sue. The "liberal construction" of remedial statutes is justified in order to effectuate the congressional goals in enacting the statute. <u>See</u> <u>California v. American Stores Co.</u>, 495 U.S. 271, 279 (1990). Here, where everyone agrees that the goal of the 1997 Act was to provide Amtrak with expanded opportunities to reach financial viability, a

liberal construction of the statute in order to effectuate that goal simply does not–and cannot reasonably or plausibly–lead to the conclusion that Congress intended to give the shareholders the right to sue Amtrak to force redemption at a price acceptable to the shareholders.  The Court cannot impose on the 1997 Act a construction not reasonably supported by the language of the Act or a meaning not intended by Congress merely because the statute could be construed as being a remedial one.

The "purpose" <u>Cort</u> factor thus weighs in favor of the Court's determination that Congress did not intend to create a private right of action in the 1997 Act.

### iv.  State Law

Clearly, matters concerning Amtrak and the constitutional causes of action set forth in Plaintiffs' complaint are not traditionally relegated to state law, so it would not be inappropriate for the Court to infer a private cause of action based solely on the 1997 Act.  However, this factor does not tip the scales in favor of finding that Congress intended to create a private right of action with the 1997 Act.

### d.  Conclusion

For the reason set forth above, the Court finds no implied private right of action in the 1997 Act.  Therefore, to the extent that Plaintiffs' Fourth Claim rests on an assertion that their due process rights were violated when Amtrak did not give

them notice and an opportunity to be heard on the issue of the stock redemption, the claim fails because Plaintiffs have not shown that they have a property interest in the redemption.

To the extent Plaintiffs' Fourth Claim rests on an assertion that the property interest they seek to vindicate is the interest they hold in the stock, as opposed to the redemption of the stock, the Court finds that the complaint fails to set forth sufficient factual allegations from which a cause of action on this theory could plausibly be found. Specifically, there are no factual allegations in the complaint supporting a reasonable inference that Plaintiffs have been deprived of their stock. On the contrary, it seems clear that they still retain the stock, but they contest Amtrak's valuation of the stock and appear to take issue with Amtrak's management that, they allege, has led to a devaluation of the stock. Neither of those amounts to a deprivation of property implicating the Due Process Clause of the Constitution. Plaintiffs have pointed to no authority that would compel a different conclusion, and the Court can find none on its own review.

Even if the Court were to find that Congress intended to create a private right of action with the 1997 Act or that Plaintiffs were somehow deprived of their property rights in their stock despite the fact that they still retain the stock, Plaintiffs' Fourth Claim would nonetheless fail by the express

wording of the statute.  The 1997 Act was codified as a note to 49 U.S.C. § 24304, Subtitle V, Part C.  Section 24103(a)(1)(C) of 49 U.S.C. provides that all equitable actions brought pursuant to Subtitle V, Part C against Amtrak may only be brought by the Attorney General.  49 U.S.C. § 24103.  As noted above, the Court has determined that Plaintiffs' Fourth Claim is an equitable claim. Therefore, pursuant to 49 U.S.C. § 24103, that claim may only be brought by the Attorney General and not by Plaintiffs.  Plaintiffs' argument that the Court should, essentially, ignore the plain language of the statute because the 1997 Act was codified as a mere note to section 24304, presumably as opposed to meriting its own section, is unpersuasive.  Plaintiffs have provided no authority indicating that a court should ignore notes to the U.S. Code or otherwise see laws that are codified in the form of notes as not being a part of the Code to which they are appended, and the Court has been unable to find any such authority on its own.  The 1997 Act was codified in the U.S. Code in the manner chosen by Congress. The fact that it appears as a note to section 24304 of Title 49 does not mean that the other limitations, mandates and rules set forth in Subtitle V, Part C should not apply to the 1997 Act.

In addition, as Amtrak notes, the fact that section 24103 of Title 49, which includes the Attorney General provision, was enacted well before the 1997 Act cuts against Plaintiffs' argument. Congress is presumed to be aware of its earlier enactments.

International Union, United Auto., Aerospace & Agric. Implement
Workers of Am., Local 737 v. Auto Glass Emp. Fed. Credit Union, 72
F.3d 1243, 1248 (6th Cir. 1996)("It is a settled principle of
statutory construction that when Congress drafts a statute, courts
presume that it does so with full knowledge of the existing law.").
Here, this means that the Court presumes that Congress was aware of
the Attorney General provision of 49 U.S.C. § 24103 both when it
enacted the 1997 Act and when it chose to append the Act as a note
to section 24304 of Title 49. For the reasons set forth above, the
Court finds that the 1997 Act is subject to the limitations imposed
by 49 U.S.C. § 24103, which expressly provides that equitable
actions are to be brought solely by the Attorney General.
Plaintiffs' Fourth Claim is an equitable action.  Therefore, even
if the Court were to find that the 1997 Act created a private right
of action or that Plaintiffs had alleged sufficient facts from
which a plausible cause of action relating to the deprivation of
the stock itself, Plaintiffs' Fourth Claim would be subject to
dismissal, as it may only properly be brought by the Attorney
General.

        The Court is not unsympathetic to Plaintiffs' plight.
The fact that the Attorney General may not be motivated to pursue
the equitable rights of four shareholders is, indeed, an obstacle
for Plaintiffs.  Plaintiffs' most compelling argument in favor of
finding a private right of action is that without the ability to
sue Amtrak for failure to redeem the shares Plaintiffs are subject

to Amtrak's whim.  Unfortunately, if Congress did not intend to create a private right of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001).  Neither Plaintiffs nor this Court can wish a private right of action into existence when Congress has not indicated its intention to create one.

**V.    Violation of the Amtrak Reform and Accountability Act of 1997**

Finally, in their Seventh Claim, Plaintiffs contend that Amtrak violated Section 415(b) of the 1997 Act when it "unilaterally and erroneously" valued Plaintiffs' shares at "zero or nearly zero" and failed to offer fair market value for the stock.  Because the Court has determined that the 1997 Act did not create an implied private right of action, this claim fails, and Amtrak is entitled to dismissal of the claim.

**VI. Conclusion**

The Court has thoroughly examined the matters presented in Amtrak's motion to dismiss and Plaintiffs' response thereto and has concluded that Plaintiffs' complaint cannot withstand the motion.  Although the heart may point in one direction, the Court is bound by the constraints of the relevant case law and the mandates of the Constitution.  For the reasons set forth above, the Court GRANTS Amtrak's motion to dismiss (doc. 58).  Consequently,

this matter is DISMISSED from the Court's docket.

      SO ORDERED.

Dated:  June 21, 2011      <u>s/S. Arthur Spiegel</u>
                                      S. Arthur Spiegel
                                      United States Senior District Judge